**UNITED STATES v. WEINBERGER et al.**

District Court, D. New Jersey.

April 21, 1933.

See, also (D. C.) 38 F.(2d) 298.

George Z. Medalie, U. S. Atty., of New York City (Edmund L. Palmieri, of New York City, of counsel), for the United States.

Harry Weinberger, of New York City, pro se.

CLARK, District Judge.

This opinion and the appropriate order writes the last New Jersey chapter of a story which has not, in our judgment, been much of an advertisement for Jersey or any other sort of justice. The acts, whose repetition the courts are asked to deter by appropriate punishment, occurred in 1928. The intervening five years have been occupied by more or less constant efforts to apportion the responsibility therefor. How successful these endeavors have been will appear in the course of this opinion.

Our discussion may be and therefore is addressed to answering three questions: First, what did Weinberger, the petitioner-defendant, do to the innocent public (what happened in the world of finance)? Second, what did the state and nation do to him in return (what happened in the world of law)? Third, is this court equally impotent? To relieve the suspense let us reply in outline at once. Weinberger removed about $5,000,-000 from the pockets of confiding investors and left them with only hope. The state and nation attempted a great deal and the nation has so far accomplished an indictment. This court is ordering his removal for trial on that indictment.

The petitioner herein, a member of the bar of this state and therefore by ancient ritual an officer of this court, was indicted on May 22 and June 5, 1931, by a grand jury sitting on the other side of the Hudson river. This indictment charges him with using the mails in a scheme to defraud in contravention of section 338, title 18, of the United States Code Annotated. The district attorney for the adjoining district (Southern of New York) desires, not unnaturally, the removal of our indicted officer that he may answer for his offenses, if any, before a jury of his peers. In pursuance of that purpose, he appeared before a commissioner of this court and requested the arrest and imprisonment (commitment) of the defendant Weinberger pending application to a district judge for a warrant of removal. This procedure is permitted by the terms of the governing statute (section 591, title 18, of the United States Code Annotated). As the actual removal is intrusted to the district judge and to him alone, we confess we can see little purpose in the prior application to the commissioner. The district judge is of course also empowered by the statute to commit, and the entire matter can, therefore, be adjudicated by him. Furthermore, as he has the duty to remove, the objecting defendant has the right to offer evidence before him. The double procedure has resulted in an additional year's delay in the case at bar.

The codefendant in the indictment is not an officer of any court, but is a banker and, therefore, we suppose, a member of our newly created untouchable (perhaps deservedly) class. He is also a resident of New York and seemed to prefer that state, even with an indictment, to this without one. At any rate, he surrendered to the United States marshal in the Southern District and pleaded not guilty.

Not much attention has so far been paid to the investment trust phase of the recent economic extravaganza. The use of the word "trust" seems a misnomer coined for the gullible. The so-called "trusts" are simply holding companies for various kinds of stocks whose selection is intrusted to the directors thereof—hardly the common interpretation of the word "trust." It may be some satis-

faction to lose your money with the help of the "wise men" (page that ancient Greek, Samuel Insull). When we do start to search that part of the financial ruins, we suggest the investigation of the English investment trusts of the 1870's as a guide.

The current excuse for what has happened seems to be that the aforesaid "wise men" had "too much confidence in America" —an aphorism which it rather seems to this court would read more accurately if reversed. However that may be, the events now to be described happened long before that period of excessive optimism or excessive stupidity, depending on one's reading of the above. We mention this, because petitioner is now inclined to insist otherwise and to class himself with the other now discredited financial figures.

We shall have to concern ourselves in some detail with the particular acts of the defendants to which the government objects. As a background we might first give a general outline of the scheme which, it is charged, is one to defraud. Much of the background has been furnished by the petitioner's attempted justification. Certain facts, not essential to the charges but useful to a narrative understanding, are available in the records of the New Jersey Legislature and of the New Jersey courts.

The petitioner-defendant was, in addition to his other duties, president and a large stockholder of a trust company in the city of Passaic, N. J., dedicated like many other American institutions, in name at least, to Service (with a capital S). The examiners for the New Jersey department of banking and insurance had complained of indications that the loan policy of this institution favored the borrower rather than the depositor. The chill wind of stupidity or worse was already coating the surface of the subsequently frozen reservoirs of assets. President Weinberger accordingly suggested to a friend and fellow attorney that a merger of the Service Trust Company with some other, and presumably stronger, banking institution might provide warmth for the necessary thaw.

A principal bank in Passaic was and is, as might be expected from its name, the Hobart Trust Company. Petitioner and his friend Campbell, the codefendant and vice president at that time of a New York bank, obtained on August 12th an option on 2,000 shares of the stock of the Hobart at $650 a share. This stock was then sold to the Service Trust (petitioner's bank) at a profit of $200,000. This increment was tactfully distributed by the use of certificates of deposit payable at gradual intervals. (This transaction was the subject of indictment No. 489 of Passaic county.) The sale was accompanied by a guaranty running to the Service Trust Company that the stock would be repurchased at a profit to them of $100,000. The performance of this guaranty was quite simply accomplished by the repurchase of the stock from the Trust Company by Weinberger and Campbell at the advance agreed upon. One might be surprised at the willingness of the latter gentlemen to make an ostensibly unnecessary gift. The subsequent procedure makes it quite apparent that the generosity was entirely on the part of the alleged victims of the scheme to defraud.

On August 19, 1927, the New Jersey Bankers' Securities Company was incorporated. Its principal office was the aforementioned Service Trust Company building, and Weinberger was designated as its statutory agent. The first business of the infant corporation was to buy, on August 26th, from Weinberger and Campbell, the 2,000 shares of the Hobart Trust Company aforementioned and 1,100 shares of the Equitable Title & Mortgage Company, another Weinberger institution. This purchase was paid for by the issue to Weinberger of 250,000 at $10 per share. The directors allocated $1,799,000 of this amount to the purchase of the Hobart Trust Company stock. Thus Weinberger and Campbell were permitted a profit of $499,000 in addition to the $200,000 already recorded. Furthermore, they had no occasion for the use of money in the transaction because the company obligingly paid the original owners of the Hobart stock. So, in ten months, the stock of that bank increased in value in the amount of $400 a share approximately. The methods whereby our banks have earned money are becoming daily less mysterious. Nevertheless, such an appreciation would seem to require the immediate closing of all the other banks in the state and the simultaneous repeal of the laws against usury (that earliest of all legal checks on the natural law of supply and demand).

On September 15, 1927, the capital stock was increased to 2,000,000 shares of no par value. Of this amount it was agreed 150,000 might be purchased at $10 and 500,000 at $12.50 a share by Weinberger. This stock was not disposed of by any underwriting device but directly to the public. So no opportunity arose for the use of the "on cer-

tain information we believe to be reliable." We are not concerned with the campaign. We gather it to have been of the type now tiresomely familiar. It seems to have been assumed, and correctly as it turned out, that the residents of New York City would be those most interested in New Jersey banks. Distance lent enchantment to a view of bank stocks. The company forthwith entered into a contract with a selling organization, a corporation known as the Allied Bankshares, headed by one Cooke, who has now disappeared. After a quarrel with the latter, their own selling organization known as the New Jersey Continental Bankshares Corporation was set up with offices at 350 Madison avenue, New York City. Through the efforts of these organizations, the public ultimately paid approximately $7,000,000 into the treasury of the New Jersey Bankers' Securities Company.

With the funds thus obtained, the New Jersey Bankers' Securities Company then invaded the neighboring county of Essex. We use the military term because Weinberger voices the belief that some of the bankers in the commercial center of New Jersey objected to him and his methods. An impression which could be described in biblical phraseology, "and well they might." At any rate, the control of three small Newark trust companies, the Washington, the Weequahic, and the Liberty, was purchased at a price out of all conceivable relation to the book value of their stocks. The owners of the large institutions resisting for some reason his blandishments, Weinberger again increased his range and gained control of the Lebanon, a small bank in uptown New York. Then he also purchased national banks in Jersey City and in Perth Amboy and a trust company in Newark. Although rejected in his attempt to obtain control of the larger banks in Paterson and Newark, the efforts to acquire their stock resulted in some small holdings therein.

This holding company for bank stocks having been created, how was it operated? According to the government, fraudulently. The scheme in their view contains six factors. We have already discussed the initial one— the purchase and resale of the Hobart stock. We continue with the other five.

Syndicate managers, promoters, stockbrokers, and mail fraud operators, all recognize the usefulness to their business of the acquisitive instinct. That instinct is curiously sharpened by a rising market. That sort of market depends on the same old law, supply and demand. That being a natural law does not always operate as we desire it (vide the depression). What is easier than to create a demand? Nothing, if you have no objection to a little market rigging. The nautical terminology is probably intended to depict the promoters' sailing to prosperity.

This operation is, as may be readily imagined, simply causing the supply and demand to come from the same source; in other words, the treasury of the New Jersey Bankers' Securities Company. For this innocent purpose, a specialist, one Ben Guibert, was employed by the New Jersey Bankers. Mr. Guibert immediately engaged various brokerage houses to act as his agents.

About $7,000,000 were received from sales and subscriptions. The government accounting showed without contradiction that 172,034 shares had been purchased at an average price of $16.50. Both Mr. Lewis, the government accountant, the government attorney, and the court's calculations make this 36 per cent. of the moneys received. A worse example of boot strap finance has never come to our notice. More than one-third of the stockholders' money was used, not to purchase banks which would earn money for them, but to purchase their own stock at a loss. If there were nothing else in this case, the scheme to defraud is exposed here. Weinberger suggested some legal mummery from the corporate certificate in extenuation. We might concede, without deciding, that the New Jersey Bankers had power to purchase its own stock. No charter can justify fraud and to offer it for such a purpose begs the question.

There were statements and intimations on the proofs that some of the stock so returned to the treasury was the petitioner-defendant's own. The attempts to so ascribe it seem to have met with the usual difficulties of tracing stock certificates through various and anonymous hands. At any rate, there was no failure of proof as to what became of certain of his shares. As we have observed, he obtained 250,000 shares of the New Jersey Bankers as the price for his Hobart stock. A month later he agreed that he would resell 150,000 of this stock at $10. Not satisfied with the profit already criticized by the government, he violated this agreement and boosted the resale price an additional $2.50 a share for 72,000 shares. An additional and further unconscionable profit of $181,000 was thus received.

To help the rising market rise, nothing is

such an effective yeast as favorable indications of successful operations. The most significant evidence of such indications are earnings and the usual tangible evidence of earnings is to be found in favorable annual statements and their usual offspring, dividends. The New Jersey Bankers' Securities Company issued a balance sheet as of January 31, 1928, some time in February, which they published in the newspapers. This so-called balance sheet purported to be based on a balance prepared by Markel & Co., the certified public accountant of the company. There were also essential differences. So essential that Mr. Markel, the head of the firm, considered his signature would be a reflection on his professional honor and resisted considerable pressure in maintaining his refusal to affix it. Mr. Markel listed the lapses from proper accounting as three in number: First, the failure to state the cost of the securities in the company's portfolio. This was over a million less than the market price, which was stated. As the market for stock in small banks was a restricted one and, therefore, largely artificial, the importance of this omission is readily apparent. The second thing that Mr. Markel objected to was the failure to mention the fact that listed among the subscriptions receivable was a note for $412,803.25 of the State Finance Corporation, one of the petitioner-defendant's numerous private, so to speak, corporations. This was not a subscription at all, but a note to cover an overdraft of Weinberger's. The third criticism of the accountant was directed to a general statement of the surplus which failed to separate the appreciation of security values from the actual operating surplus, a difference between fifty thousand and a million dollars.

An even more curious transaction was the declaration of a dividend of $100,000 by the New Jersey Bankers' Securities Company in April, 1928. The company had only earned actually $3,700 and a dividend could not be legally declared out of appreciated surplus. Funds must be made available somehow. A very simple expedient was adopted; the zenith of inflation because it created something out of nothing. Weinberger offered to have the same State Finance Corporation buy 2,000 shares of Hobart stock at $125 a share. This would have shown a profit of $100,000. This purchase was to be financed by the State Finance Corporation borrowing the money. While the loan was being negotiated, Weinberger anticipated its success by making out a blank check. Anticipation, as often, was not realization. The loan was never made,

the check never signed, and, one might assume, the dividend never declared. A most unjustifiable assumption in the affairs of the New Jersey Bankers' Securities Company, because the only effect of the failure to get the money was on the books of the company.

The fraud which we have so far discussed has been in action and not in speech. The government charges that Weinberger violated the canons of truth as well as those of fair dealing. Their contention is based upon a circular published on May 20, 1928, and euphemistically addressed to the "timorous and uneasy stockholders in the New Jersey Bankers' Securities Company." The particular cause for fear and nervousness at that time was a legislative investigation. The bulletin, as it was called, disposed of that interference with legitimate business by the assertion that it was prompted by jealous bankers who feared the financial prowess of the petitioner. In order, however, to leave no doubt in the minds of the stockholders as to the exact quality of that prowess, the bulletin went beyond this criticism of the motives of those persecuting the company. It indulged in some statements of fact that were designed to convince the stockholders that the condition of their company afforded good ground for jealousy.

As they were a bank stockholding company, this ground must naturally depend on large holdings of bank stocks and the bulletin proceeded to advise of just such holdings. They printed a column under the large caption "Our Holdings" and the subhead "Substantial Holdings In," wherein they listed eight banks, savings banks, and/or trust companies including the Paterson Savings Institution and the Federal Trust Company of Newark. On the opposite page and under the reassuring legend, "A Statement of Strength," we find a recapitulation of the resources of these eight institutions reaching the awe-inspiring total of $183,000,000. Obviously, if you have a share in a substantial holding of all that amount of money, you have something.

Unfortunately for the shareholders, the authors of this bulletin took a very liberal view of the meaning of the word "substantial." The Century Dictionary defines it, "of *ample* or *considerable* amount, quantity or size." This is, of course, both the popular conception of the term and the meaning one would expect from its derivation (to stand under or support). The Securities Register of the New Jersey Bankers' Securities Company offered in evidence by the govern-

ment makes no mention of any holding at all, in either the Paterson Savings Institution or the Federal Trust Company, and lists only a small number of shares in the other institutions mentioned.

The petitioner did try ·to explain the Federal Trust item on some theory of a contract to purchase. No such contract was offered. Furthermore, in the very column complained of, there was a separate heading for "contracts to purchase control," surely near enough to suggest a specific listing for the "contracts to purchase." Even if there was a contract, one could hardly say a substantial holding included a chose in action unless one were advised of the obligation of the New Jersey Bankers' Securities Company thereon. We must conclude that the college education of the stockholders' children so gloriously portrayed in another part of the bulletin would have to be the "knowledge we get by mail" if it depended upon the profits from stock held by the New Jersey Bankers' Securities Company in any or all of the institutions advertised in its bulletin of May 29, 1928.

We submit that if the circumstances related above actually occurred, it is not surprising that the Legislature of New Jersey should take cognizance thereof. At any rate, in the spring of 1929 it did interest itself to the extent of protracted hearings published in a 400-page volume. The events ensuing upon these proceedings took place in the Court of Chancery of New Jersey. As the Vice Chancellor concerned is eminently capable of self-expression, we shall accord him the "privilege of our columns." Three extracts from Vice Chancellor Backes' filed opinions set forth the situation with his accustomed force and clarity. They were all made necessary by the application of a stockholder for the appointment of a receiver of the New Jersey Bankers' Securities Company and appear sub nomine: Bernstein v. New Jersey Bankers Securities Co., in 146 A. 60, 7 N. J. Misc. 479 (Court of Chancery); Bernstein v. New Jersey Bankers Securities Co., in 109 N. J. Eq. 233, 156 A. 768 (Court of Errors and Appeals); Bernstein v. New Jersey Bankers Securities Co., in 151 A. 465, 8 N. J. Misc. 685 (Court of Chancery). ·We quote:

· "After the disclosure before a legislative committee which investigated the affairs of the Bankers' Company and the activities of Harry Weinberger, its promoter, a bill was filed for a receiver of the company in which the directors were charged with serious mis-conduct, in corporate management; and particularly Weinberger, the master mind, who ran riot with the company's finances and is still at large. The court sat in that case and is fully informed of the then situation. The suit was eventually discontinued upon a reorganization of the directorate and the election of the present board, the individual defendants in this action, and after Weinberger agreed to purchase 172,034 shares of the company's stock and thereby restore to its treasury $2,500,000. This, by paying $200,000 in cash and giving his note for $2,-300,000 secured by collateral and a guaranty to the extent of $50,000 by each of the members of the old board responsible for the debacle." Page 61 of 146 A., 7 N. J. Misc. 479.

"It is proved beyond peradventure that the company carried on its business at a great loss from the time of its inception until the time of the filing of the bill and that at the time of the filing of the bill it was carrying on its business at a great loss. The seed of the loss was sown in the early period of the company. The company was supposedly organized to deal in securities, primarily bank securities. The ostensible object of the incorporators was to control banks—a chain of banks. The incorporators were successful in inducing ten thousand people to part with over $8,000,000 upon their assurances and in the hope and expectation of large and quick profits. Many, if not all, moved in a spirit of speculation, not investment. One man says he invested $80,000. Speculated at $10 per share, expecting to reap in a short time $25 per share, and this upon representation made to him. The public was deluded, parted with its money, speculated under pressure of false pretenses; by a false pretense, establishing of a false value in the market for the stock; and the money of the company was used, nearly $3,000,000 was used and lost by its officials to establish a false value upon which the public invested its $8,000,-000. Of the eight million we have about two million left. The six million has been wasted; wantonly, unlawfully wasted; nearly three million to 'rig' the market, and the balance in buying control of banks at fabulous prices, with corrupt circumstances attending the purchase and sale to the bankers of some of them, all to the loss of the stockholders. The precarious condition of the company in the summer of 1928 when a new board took charge, with the court's approval, until the summer of 1929, when temporary receivers were appointed, was due to past misconduct. The corrupt practices occurred in 1927 just

after the company came into being. The extent of the losses suffered through its misconduct was unrealized until after the receivers were appointed; then the stocks, bought at exorbitant prices, did not yield anywhere near their cost; and they had to be sold. The history of the company is tragedy from its inception. The downfall of the company in the summer of 1928 was not,. as suggested, due to the legislation prohibiting companies of this kind holding bank stock beyond 10 per cent. of any bank's capitalization. That legislation was not the cause, but the result, of the exposure by the Davis committee of the conduct of the directors. The foul things exposed—conduct of the management—resulted in the downfall. The pity of it is that receivers were not appointed when the Meyers bill was filed about that time. Had they been, we would not have lost the $2,000,000 in the forced sale of Hobart Bank stock. The court was then persuaded, as it is now sought to persuade it, to give the company back into the hands of responsible men; and the men who then assumed directorship were responsible men of the community. It was then the consensus of opinion of those interested that that would be the better thing to do. The members, one by one, tired of their, or abandoned their, trust, and for reasons in many, if not all, instances, for the protection and safeguarding of their own reputations." Pages 768, 769 of 156 A., 109 N. J. Eq. 233.

"The board of directors had disintegrated, following a bitter strife among the members over the attempt of the majority to hand over what was then nearly $4,000,000 of cashable assets (Hobart Trust had not then collapsed) to Weinberger's friend Spielberg for his worthless stock in his Equitable Finance Company. Had the deal not been blocked by injunction in the first Bernstein suit, all would have been wiped out, and Weinberger in all likelihood would by now have been relieved of liability on his $2,-300,000 note to the company given to account for his earlier misapplication of its funds, for there can be little doubt that he had arranged for that with Spielberg." Page 466 of 151 A., 8 N. J. Misc. 685.

The learned Vice Chancellor's estimate of the Equitable transaction was quite justified by the event. The Equitable Finance Corporation collapsed, and its president, Harold Spielberg, referred to in the Vice Chancellor's opinion as enjoying the friendship of Weinberger, is now under indictment in New York county for larceny. It is interesting to observe that this same Spielberg controlled

three successive bail bonding companies, the Equitable, the Grand Central, and the Lexington Surety Company, which operated in this and other courts. The writer of this opinion protested the licensing of these companies by the United States Treasury as far back as 1928. His protests were received with scant courtesy in Washington, but as all the companies finally failed, his excluding them from his own courts seems to have been justified. Criminal bail bonding companies controlled by suspected criminals—an innovation even for American criminal justice. This concludes the recital of what the petitioner succeeded in doing to the public. By contrast we turn to what the courts have succeeded in doing to him.

Shortly after the first attempts of the New Jersey Court of Chancery to salvage the wreck of the New Jersey Bankers' Securities Company, the Supreme Court Justice holding the circuit of the petitioner's home county suggested to the grand jury of that county that the type of navigation that had been displayed called for the punishment of the navigating officers. In response to his charge and on August 28, 1929, the grand inquest for Passaic county returned six indictments.

One indictment (No. 469, April term, 1929) accuses Weinberger, his brother, and Campbell of making a profit at the expense of the Service Trust Company of which they were directors by selling to it Hobart stock and of concealing that profit by means of a series of certificates of deposits. A second (No. 494, April term, 1929) charges the petitioner with pretending to the board of directors of the New Jersey Bankers' Securities Company that their company had earned its dividend and supporting such pretense by a worthless check. A third (No. 490, April term, 1929) alleges that Weinberger embezzled $412,803.25 of the funds of the company. In a fourth (No. 495, April term, 1929) Weinberger is asserted to have cheated the New Jersey Bankers' Securities Company by receiving from them large amounts of stock without paying for them "by receiving a half million illegal profit." The two remaining indictments (Nos. 492 and 493, April term, 1929) concern the issuance by Weinberger (March 1 and April 5, 1928) of two financial statements of the condition of the company which were false and for the purpose of inducing the purchase of stock therein. We have discussed these matters so far as they appear in the principal case. The false financial statements could not be considered by the

government because the statute of limitations had run by the time the case was finally presented to the grand jury.

The immediate reaction of Weinberger to these indictments was somewhat inconsistent with his present position. He rushed to the United States courts. His petition for removal was filed on November 4, 1929. It rested upon section 31 of the Judicial Code (section 74 of title 28 USCA), which provides for removal to the United States courts upon proof of a denial of civil rights in the state courts. As is well known, this section stems from the Civil Rights Bill of 1866 and was drafted for the purpose of protecting the negroes in the exercise of their newly acquired rights. Weinberger was optimistic if he expected his appeal to the Judicial Code to be of any avail. An examination of the cases cited under that provision (title 28, pages 545–551, USCA) reveal no case of removal not based upon the historical background (denial of rights to negroes). The explanation for this absence of authority is a simple one. The courts interpreted the statute in the light of the original language of 1866 (14 Stat. 27)—itself an extension of the Fourteenth Amendment from state Legislatures to individual action under color thereof. They restricted the removal accordingly to a denial of civil rights, resulting from the Constitution or laws. It is quite obvious that states are quite unlikely to adopt constitutions and pass laws in deliberate violation of the civil rights of the citizens of the United States.

Petitioner's allegations of such violations amounted to an attack on the good faith of the machinery of justice of Passaic. Why he should object to it is not apparent, because, as we shall see, it never did him any harm. The chief target of his attack was the Supreme Court justice holding that circuit. He claimed that the justice's charge to the grand jury we have spoken of, disqualified him for interest and bias. Of course, the court's charge resulted from no Constitution or law of New Jersey, and the petition of removal was equally, of course, remanded by the judge of this court hearing the same. As a matter of fact, it would be a curious doctrine which disqualified a judge for doing his duty and informing the grand inquest of circumstances which came properly within their function. Judges have so assisted the grand jury from time immemorial. It is difficult to see why the United States courts should correct the bias, if any, of the trial judges of the state of New Jersey. In view of what later happened it is perhaps unfortunate that the legal exigencies required a remand. (D. C.) 38 F.(2d) 298. We venture the opinion that a jury in this court would have reached some decision some time in the intervening three years.

It is not our business to comment on the law enforcement of Passaic county. The records seem to indicate that two of the above-mentioned indictments were tried. In one of them the witnesses suffered from imperfect recollection and the court directed a verdict. In another, the jury suffered from defective decision and disagreed. The day after the disagreement the prosecutor nolle prossed the four remaining indictments. These proceedings can hardly be characterized as the exoneration frequently referred to by the petitioner in his comments to the commissioner. In short, the state courts in two years had accomplished just nothing.

Let us see how the United States courts fared. On July 24, 1929, a stockholder of the New Jersey Bankers' Securities Company, writing for himself and the women employees of his office, complained to the United States attorney for this district. On July 31st, the assistant in charge of indictments forwarded this complaint to the chief postal inspector in Washington. An investigation was made by two post office inspectors assigned to New Jersey and two Department of Justice accountants. This investigation lasted for fourteen months, half the life of the investigated company. The report summarizing these protracted efforts requested authority for the circularization of stockholders for the false financial statement (subject of Passaic county indictment No. 493) of February 28, 1928, and for presentation of the case to the United States attorney. On October 6th, the post office solicitor granted the required authority. Three weeks later the postal inspectors requested a "conference" with the United States attorney. Their letter (October 25, 1930) contains this significant sentence: "The time remaining by reason of the Statute of Limitations, is comparatively short as the financial statement mailed and to be attacked was distributed February 28, 1928." On February 6, 1931, this meeting was held at Trenton. A report was requested and was submitted on February 18th. Obviously the statute of limitations had now excluded the false financial statement stressed by the inspectors.

More deliberation and deliberators now seemed essential. A request was made for the assignment of a special assistant to the

Attorney General to New Jersey and the special assistant appeared in Trenton on March 16th. This gentleman reviewed the case with the inspectors from March 12th–20th. At first he was of the opinion that the case should be presented to the grand jury in New Jersey. After talking with the Attorney General's office on April 8th, he changed his mind about this and decided upon New York as the forum. On April 30th the special assistant from Indiana conferred with the United States attorney in New York. The latter functionary called his grand jury into action on May 7th and indictments were handed up May 22d and June 5th. By this time, of course, all mailings but the one, the New Jersey Bankers' Securities Company News Bulletin, had been outlawed.

On June 19, 1931, the commissioner issued his warrant as authorized by section 591 of title 18 USCA, requiring the defendant indicted in New York to show cause why he should not be held. The defendant did answer and at some length. Hearings were held at intervals between June 19, 1931, and January 24, 1932. On May 9, 1932, the commissioner found that the defendant should be held to await the order of the judge whose duty it is, under the statute, to remove. The commissioner, due no doubt to a misunderstanding, embodied his findings in the form of very brief conclusions. He did not attempt to analyze the voluminous testimony to which he had listened for so many weary months or to base those conclusions on any exposition of such analysis. The United States attorney for New Jersey requested this warrant on May 11th, and on May 20th, as might again have been expected, the defendant petitioned for a writ of habeas corpus. The writ was issued and returned on June 21st.

One might have assumed that the proceedings before the commissioner should be reviewed qua proceedings. The itch of our criminal jurisprudence for prolongation prevents such a happy consummation. So the person whose removal is requested is permitted by controlling authority to offer further evidence upon the return of his writ of habeas corpus. Additional testimony was accordingly received on July 18 and August 29, 1932. The last word was (in the form of briefs) received in October. This brought the case within the present term of our Circuit Court of Appeals. As petitioner, as was his right, stated he would appeal an adverse judgment, the time of filing of the present opinion gives the government the earliest opportunity for argument of such appeal in the higher court.

Judges are primarily concerned with interpreting law as it exists. They are often, however, in the best position to observe the unwise consequences of that existing law. We may be excused perhaps if we indulge in a brief criticism of the existing law of removal from one federal district to another. We feel more free to do so as the precedents (the lawyers' broomstick) here are created by judges and not by legislators. Having given, we can take away. It will be conceded that the legal broomsticks aforementioned declare the law as follows: The judicial officer can remove only upon finding that there is probable cause to believe (1) that there has been an indictment, (2) that the person present for removal is the person mentioned in the indictment, (3) that the crime charged in the indictment has been committed in the removing state, (4) that the person presented is guilty of the crime charged in the indictment to have been committed in the removing state. Let us examine these declarations with a jaundiced eye.

It is obvious that the apprehension of enemies of the state often depends upon an element of surprise. It is equally plain that such seizure of suspected persons works a hardship and an injustice if the suspicion turns out to be unfounded. It is necessary here as elsewhere, therefore, to reach a balance between the conflicting interests, the state and the individual.

An arbitrary exercise of the state's powers to effectively dispose of its enemies (real or imagined) inevitably alters the form of the power, and often of the state itself. The lettres de cachet ultimately toppled the Bastille. The general warrants and their application to John Wilkes wrote the Fourth Amendment into the Constitution of the United States. Lecky, England in 18th Century, vol. IV, p. 271; Campbell's Lives of the Lord Chancellors (Lord Camden) vol. V, 435; Boyd v. U. S., 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746.

On the other hand, time is the opportunity of the criminal. A too elaborate procedure to prevent oppression results in the negation of enforcement. So, the machinery of the preliminary hearing was devised to establish a useful balance. Its creation is partly statutory and partly judicial. The earliest statute is that of 2 and 3 P. and M. c. 10.

We can all agree that it is wise to subject the accusation to an impartial review (judicial scrutiny). There will be less accord in the principles that should govern the re-

view. One might suppose that those principles would be based upon the source of the accusation, the quality of the testimony adduced in support of it, and their mutual interrelation. An examination of the cases discloses them barren of any such logic. In the first place, the courts have attempted to prescribe rules for the weighing of testimony. They have attempted to strait-jacket the mental processes of their members. For this purpose, the law has used various adjectives and adjective phrases to characterize its appraisal of the quality of proof. So we hear of: Beyond a reasonable doubt, clear, cogent, convincing, satisfactory, preponderance, prima facie, presumption, probable, reasonable, and possible. All these deviations from the humanly unattainable certainty are designed to meet the justice of the particular occasion. Would it not be better to leave that to the trier without these attempts at guidance? Especially as the said trier is pretty apt to use the slogan just that way anyway.

For the particular occasion of the preliminary hearing (as in certain other branches of the law), the courts have used probable in the curious—grammatically speaking—phrase probable cause. Whether there is any significance in this joinder is obscure. The cases define "probable" in the dictionary sense—as supported by evidence which inclines the mind to believe, but leaves some room for doubt, Kelch v. State, 55 Ohio St. 146, 153, 45 N. E. 6, 39 L. R. A. 737, 60 Am. St. Rep. 680, but when the noun is added seem to depart from the lexicon and talk of an apparent state of facts found to exist upon reasonable inquiry, 32 Cyc. 402, and cases cited. We incline to the opinion that "probable" should be given its precise meaning and indicates the taking of a certain liberty with reason. The confusion well illustrates the futility of the touchstone.

At any rate, it is certain that stronger diet was doled out by the common law. So Sir William Blackstone says (Cooley's Blackstone, 4th Ed., vol. II, chapter XXII, pp. 1448, 1449): "If upon this inquiry it manifestly appears that either no such crime was committed, or that the suspicion entertained of the prisoner was wholly groundless, in such cases only it is lawful totally to discharge him. Otherwise he must either be committed to prison, or give bail; that is put in securities for his appearance, to answer the charge against him." The more lenient, to the suspect, not the state, doctrine derives like much other bad law, from a hard case.

The hard case is, in this instance, a very famous one—no less than the trial of Aaron Burr for treason. We leave the genesis of the hardship to the historians. It is certain that Chief Justice Marshall felt called upon to protect the alleged traitor from the President of the country allegedly betrayed. Beveride's Life of Marshall, vol. III, chapter VI et sequitur. So we find the great Chief Justice saying in U. S. v. Burr, 25 Fed. Cas. at page 12, Case No. 14,692a: "On an application of this kind I certainly should not require that proof which would be necessary to convict the person to be committed, on a trial in chief; nor should I even require that which should absolutely convince my own mind of the guilt of the accused; but I ought to require, and I should require, that probable cause be shown; and I understand probable cause to be a case made out by proof furnishing good reason to believe that the crime alleged has been committed by the person charged with having committed it. I think this opinion entirely reconcilable with that quoted from Judge Blackstone. When that learned and accurate commentator says, that 'if upon an inquiry it manifestly appears that no such crime has been committed, or that the suspicion entertained of the prisoner was wholly groundless, in such cases only it is lawful totally to discharge him, otherwise he must be committed to prison or give bail,' I do not understand him as meaning to say that the hand of malignity may grasp any individual against whom its hate may be directed, or whom it may capriciously seize, charge him with some secret crime, and put him on the proof of his innocence. But I understand that the foundation of the proceeding must be a probable cause to believe there is guilt; which probable cause is only to be done away in the manner stated by Blackstone."

So we see the quality of the testimony measured by a yardstick intended to fetter the judicial cerebrations. We see further that the elastic character of the present measure is an alleged improvement on the strict rules of Blackstones. What weight have the courts accorded to the source of the accusation? Here we find an even more astonishing departure from sound thinking. The recent authorities appear to refuse any emphasis whatever to such source.

Obviously if the complaint is made by a private citizen there are considerations which might underlie it not applicable to a complaint or arrest by an officer of the government. So, also, we might distinguish between

the request to hold after an information and after an indictment. Yet we find no trace in the cases of any attention being paid to such considerations or such distinctions.

The return of an accused person from an asylum to a complaining state may be demanded as between nations, between the semi-sovereignties of a federation and between the districts of a central government. In the first two instances it is called "extradition" and is covered either by international treaties or by the instrument governing the confederation (in the case of the United States Constitution, article 4, § 2, cl. 2). In the average treaty we find our old friend "probable cause" specifically mentioned. So also in interstate extradition the unthinking repetition of the same Shibboleth occurs.

Removal within the bounds of a single sovereignty presents a much simpler problem. A uniform rule can be prescribed in any form thought wise. Actually the statute is silent. It says only that "it shall be the duty of the judge * * * seasonably to issue * * * a warrant for his removal," etc. (section 591, of title 18 USCA). The judges in our authority ridden system interpret their aforesaid duty in the light of what has been rather than with an eye on what should be. We are going to suggest this last. The removal from an asylum state presupposes legal proceedings in the jurisdiction offended. Such proceedings assume therefore a weighing of the testimony offered in support of the accusation. This appraisal may be that of the prosecutor if an information has been filed, or it may be that of a grand jury if an indictment is found. We do not believe that the competency of these officials to estimate truth should be called in question. Therefore any standard, such as probable cause, whereby their action is reviewed, should be abandoned. The supervision should be confined to the question of their impartiality. If, in other words, the information or indictment can be shown to be a persecution rather than a prosecution, the jurisdiction applied to should become in truth an asylum. We might further well require a more censorious attitude towards the action of the single prosecutor than towards the hydra-headed grand jury, one of the palladiums of Anglo-Saxon justice.

The courts have made some groping steps in this direction, although the doctrine they have announced seems quite illogical. They have been influenced by the geographical extent of the removal. Hyde v. Shine, 199 U. S. 62, 78, 25 S. Ct. 760, 50 L. Ed. 90. In effect justice is put on a mileage basis. The further you can make good your escape, the more copper riveted the case against you must be. On the other hand, the competency and impartiality of a grand jury just across the Hudson is assumed. The individual's side of the scales is almost empty. His expenses are negligible and the intangible, or exogamous factor, has very little influence. He is only a little of a stranger within the gates.

■ Now we come to the part that this court must play. Is it also impotent? We think not. We have wondered about the United States attorney's election to proceed in the first instance before a United States commissioner. This choice has at best brought into operation a rule of law which quite effectively offsets the technical doctrines which we have just been criticising. The commissioner, in the case at bar, decided that the petitioner should be held for removal. It is settled beyond peradventure that such a finding by the commissioner must be sustained if there was competent evidence to support it.

This follows from the nature of appellate justice. The individual has a right to a day in court, but not the same day in several courts. The right of appeal is statutory, an act of grace. That grace does not extend to a treadmill consideration of the same facts by several different judicial minds. So the conclusions of the first trier, who has had the advantage of seeing and hearing as well as of reading, are subject to correction only if it is apparent that the advantages have been neglected.

■ The application of even the accepted, and by us criticized, criteria for removal, to the case at bar presents no difficulty and calls for, in our judgment, only one conclusion. The petitioner's contrary view seems to us to flow from a total misapprehension, deliberate or mistaken, we do not undertake to say which, of the nature of a removal proceeding. He seems throughout to have considered that he was on trial for the crimes charged in the New York indictment. Even under a rule favoring the suspect that is not the case. His actual guilt or innocence is not even an issue. We do not, therefore, assume to pass upon it. Our recital of the facts is only from the point of view of probable cause. We think that the commissioner was justified in his belief that the government has fulfilled that requirement. The commissioner, in other words, decided that such defense was appropriate only in New York. Neither he nor this court attempted or attempts to appraise its quality.

Petitioner admitted the fact of his indictment and his identity. The commission of the crime and his guilt he contested. Here again petitioner seems laboring under a misapprehension. He has insisted that the legal incidence of the crime should be judged by the law as it is applied by the Third Circuit. Nothing would, of course, please us more than to thus give effect to our respect for our own circuit. Under settled principles of private international law (conflict of laws), however, the law applicable is that of the Second Circuit where the crime was committed.

Three elements of the crime of using the mails to defraud are in petitioner's contention lacking. They are a scheme to defraud, a mailing, and persons defrauded. We can scarcely believe that he is as serious about the first lack. We are not going to repeat our analysis of the factors offered by the government to show such a scheme. As will be remembered, they show false statements, false accounting, stock-market rigging with the funds of the petitioner's company, illegal profits to him, and an illegal dividend from the corporation as a lure. Comment on the inferences therefrom seems unnecessary.

As is usual in these mail fraud cases, there is argument about the proof of mailing. Some of the courts incline to a rather impracticable standard. Obviously even innocent business men do not record their mailings for the talkies. The clerks, etc., in charge of that part of office routine are often uncertain, in the multiplicity of their duties, if they have mailed any particular document.

At the other end of the chute, so to speak, the recipient is rarely a lawyer who has made a study of the decisions above mentioned. In consequence, such recipient does not keep the envelope, call in the police, or in any other way make sure that no loophole is here created.

In the case at bar, the mailing relied upon is the New Jersey Bankers' Securities News Bulletin. This novel venture into journalism was prepared under the direction of one McMillan, the executive officer of the New Jersey Continental, the New York selling subsidiary. McMillan was a witness for the government and testified to the preparation of the circular and its being sent to the Passaic office for mailing. The government also offered a voucher signed by the petitioner which was at least susceptible of an inference of a Passaic mailing.

It is not, however, necessary to rely upon inferences. The actual individual who received the News Bulletin in the mail was on the witness stand at considerable length. He had not preserved the guilty envelope. He had, however, noted on the bulletin itself the fact that it was conveyed to him by the United States Postal Service. The petitioner naturally tried to make this witness out as an unmitigated liar. His credibility is, as we have seen, not for the commissioner or for this court. That issue is for the jury in the Southern District of New York. This court, however, went to the unnecessary length of having the witness recalled before him. Upon this second appearance, Mr. Schwartz was equally definite and satisfactorily explained some inconsistencies in his original examination.

The petitioner has also advanced a theory which imparts into the mail fraud statute some of the elements of the civil action of deceit. Before a person can exact damages for deceit, he must, of course, have been injured—have been defrauded. Where, as in the criminal law, the state is the entity injured, the reason for damage disappears. The state is interested in preventing schemes to defraud. This seems to be the view of the better considered authorities. Schauble v. U. S. (C. C. A.) 40 F.(2d) 365. Here again the government, to meet Weinberger's objection, showed that the stockholder who received the News Bulletin refrained from selling her stock on the strength thereof. Failure to act to your subsequent injury is acceptedly tantamount to affirmative action. So much for the commission of the crime.

Finally, is there competent evidence upon which to base a probable belief that Weinberger is guilty? He can scarcely deny that the dividend was illegal as a result of his promise to buy Hobart stock with a check of a corporation controlled by him and his failure to keep that promise. He can hardly maintain that he was not concerned in the conference wherein Markel, the accountant, was urged to make the accounting changes. McMillan of the New Jersey Continental testified that Weinberger gave him the captions with respect to the various banks which, the government charges, the New Jersey Bankers' Securities Company did not own in substantial amount. The evidence of the violation by reselling to the company its stock at a certain price comes from the books of the company. The connection of the petitioner with the purchase by the New Jersey Bankers' Securities of its own stock (market rigging) was sworn to by the witness Guibert,

the specialist, who supervised the transactions. Weinberger flatly contradicted him, raising again the issue of veracity, which as we have seen is inappropriate to this (the removal) stage of the litigation. The conclusion of probable cause is plenary.

The petitioner offers an indignant denial of his responsibility for mailing the News Bulletin. The aforementioned witness McMillan is equally positive of the contrary. The truth is manifestly not in one or the other of them. The delicate and important task of estimating their respective credibilities must be left to the New York petit jury. We might call attention to the unlikelihood of such a mailing without the knowledge of the very active president of the company.

In this opinion we have included, besides our consideration of the law and facts of the case, a brief explanation of the history of the case. We have done this because we conceive that courts are as much accountable to the public as is any other branch of the government. That public has a right to pass judgment upon their functioning. A disposition to deny the people that right usually results in the continuance of an often unfounded suspicion.

We do not, however, intend to be critical of individuals. They are handicapped by a system of criminal justice which Chief Justice Taft called a "disgrace to the nation." Many methods of improving it have been suggested. Let me close by giving my own notion of the disease, and its quite simple cure. The sine qua non of the criminal is the avoidance of punishment. The sine qua non of the bar is employment and its reward. No one objects to the proper juxtaposition of these two. The accused is entitled to his day in court. He is not entitled to a system of laws whose purpose of delay is fostered by lawyer-legislators. He is not entitled to a system of judicial appointment which gives the politically active lawyer not a day in court, but a few minutes in the judge's chambers.

We do not expect the millennium within any very reasonable time. We expect we shall all go on yielding to temptation. The legal profession will still have to have fees to live and will oppose changing the system by which those fees are to be garnered. One solution is to remove the temptation by bringing the opportunities in better relation to the seekers therefor. If the legal cauldron is overfull, some of it is going to boil over into sin.

Before the American Bar Association last October, we made bold to suggest the feasibility of a certificate of convenience and necessity as a condition precedent to admission to the bar. As is known, such certificates have been prescribed for public utilities from the time when their affectation with a public interest first (1810 in this country) became significant. Must we conclude that the public is interested in laying down roads, but is indifferent to bringing up lawyers?

The warrant has been signed and filed.